## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

GLENN E. GILLE,                      )
                                     )
            Plaintiff,               )
                                     )
      v.                             )        No. 14-cv-3218
                                     )
CAROLYN COLVIN, Acting               )
Commissioner of Social Security,     )
                                     )
            Defendant.               )

## REPORT AND RECOMMENDATION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Glenn E. Gille appeals from the denial of his application for Supplemental Security Income Disability Benefits (SSI) under Title XVI of the Social Security Act. 42 U.S.C. §§ 1381a and 1382c. This appeal is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c). Gille has filed a Brief in Support of Motion for Summary Judgment (d/e 10), and Defendant Commissioner of Social Security has filed a Motion for Summary Affirmance (d/e 13). Gille filed a reply to Defendant's Memorandum in Support of Motion for Summary Affirmance (d/e 15). The matter is before this Court for a Report and Recommendation. For the reasons set forth

below, this Court recommends that the Decision of the Commissioner should be REVERSED and REMANDED.

<u>STATEMENT OF FACTS</u>

Gille was born on June 18, 1971.  He completed high school and some college courses.  Gille has not worked since he was in high school. Gille is 5 feet 5 inches tall and his weight has varied from 440 pounds to 500 pounds.  Gille suffers from obesity, asthma, cellulitis, lymphedema, and candidiasis, with ongoing edema and ulcerations on his abdominal pannus.  <u>Certified Transcript of Proceedings before the Social Security Administration (d/e 8) (R.)</u> 13, 17, 37-38, 53-54.  A pannus (also called panniculus adiposus) is a layer of fatty tissue underlying the skin. <u>Dorland's Illustrated Medical Dictionary (32nd ed. 2012) (Dorland's)</u>, at 1370.  Candidiasis is fungal yeast infection of the skin.  <u>Dorland's</u>, at 280.

On October 18, 2010, Gille saw Dr. Todd Petty, M.D.  Gille weighed 450 pounds at the time.  Dr. Petty diagnosed Gille with a biliary colic (gallstones) that required surgery.  R. 14, 221.  October 27, 2010, Gille underwent a laparoscopic cholecystectomy to remove the gallstones. Dr. Petty noted that Gille had a recurrent left inguinal hernia containing fat. R. 234-35.[1]

---

[1] The inguin is the junction between the abdomen and the thigh in the groin.  <u>Dorland's</u>, at 938.

On November 23, 2010, Gille completed a Function Report—Adult form (2010 Function Report).  R. 165-72.  Gille reported that he could not work because he could not stand more than five minutes without back pain; he could not walk more than ten feet before losing his breath; he could not sit for long without back pain and swelling in his ankles; he could not climb stairs without losing his breath; he had to use a cane to walk long distances; and he sweated excessively in his "private areas."  R. 165.

Gille reported that his back hurt when he "lay down to sleep."  R. 166. Gille reported that he took care of his personal hygiene, but he had difficulty reaching to wash his private areas and had had difficulty wiping himself after a bowel movement.  R. 166.

Gille reported that he made meals daily, such as sandwiches and microwaveable prepared foods.  He stated that he had to sit in a chair to cook.  Gille reported that he washed dishes and dusted.  He reported that he had to take breaks while doing each task.  He reported that these tasks took about an hour.  R. 167.  Gille reported that he did not do any yard work "due to shortness of breath."  R. 168.

Gille reported that he went out two to three times a week.  He did not have a driver's license because he could not fit behind a steering wheel. He went shopping about once a week, but rode in a motorized shopping

cart in the store.  Gille reported that he could handle money, but he did not have any bills to pay at the time of the report.  R. 168-69.

Gille reported that he spent time reading, watching television, playing computer games, playing other games, and listening to CD's.  He reported that his back hurt if he sat too long while engaging in these activities.  Gille reported that he spent time with others playing computer games and talking on the telephone.  He also regularly went to church, a gaming guild, and the library.  R. 169.

Gille reported that he could lift ten pounds, stand for five minutes, walk ten feet, and climb five steps.  He reported that he could not squat and had pain kneeling.  He reported that he could not bend over and touch his toes.  He reported that after he walked ten feet, he had to rest fifteen to twenty minutes.  R. 169. Gille reported that he could follow oral and written instructions well and got along with others.  He reported that he did not handle stress well.  R. 169-70.  Gille concluded, "I weigh in excess of 400 pounds and have a very hard time walking and climbing steps due to the weight."  R. 172.

On January 8, 2011, Gille saw state agency physician Dr. Raymond Leung, M.D., for a consultative examination.  R. 236-44.  Gille reported that he could walk with a cane for half a block and could lift five pounds.

R. 236.  Dr. Leung noted that Gille had a "bad odor about him."  R. 237.

On examination, Dr. Leung found decreased breath sounds with some

wheezes, but no rales or rhonchi, and no use of accessory muscles for

respiration at rest.  Gille's AP (anteroposterior) diameter was normal and

percussion testing was normal.  Dr. Leung noted that Gille developed

moderate shortness of breath during the examination.  R. 237.

Dr. Leung noted that Gille walked with a moderate limp and a waddle

with or without a cane.  Gille could walk fifty feet unassisted.  Gille could

tandem walk, but could not hop, heel walk, or toe walk.  Gille could squat

one fourth of the way down.  Straight leg testing was to 10 degrees on the

right leg and 20 degrees on the left leg.  Dr. Leung found no muscle

atrophy and no spasms.  R. 238.

Gille had decreased range of motion in his hips and knees.  R. 238.

Gille had full range of motion in his lumbar spine, cervical spine, shoulders,

elbows, wrists, and ankles.  R. 238, 240-42.  His pinch, arm, leg, and grip

strength was 4+/5 throughout.  Gille had no difficulty getting on and off the

examination table.  Gille had no edema, ulcerative lesions or varicosities on

his extremities.  Dr. Leung assessed back pain, morbid obesity, and

asthma.  R. 238.

On March 29, 2011, state agency physician Dr. James Madison, M.D., completed a Physical Residual Functional Capacity Assessment. R. 249-56.  Dr. Madison opined that Gille could lift twenty pounds occasionally and ten pounds frequently; stand and/or walk for two hours in an eight-hour workday; sit for six hours in an eight-hour workday; occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl.  R. 250-51.  Dr. Madison opined that Gille should avoid concentrated exposure to fumes, odors, gases, and poor ventilation, as well as hazards such as machinery and heights.  R. 253.  Dr. Madison opined that Gille had no other physical functional limitations.  R. 251-56.  Dr. Madison opined that Gille's 2010 Function Report was partially credible.  Dr. Madison noted that Gille was able to sit at the consultative examination and walk to the examination room.  R. 256.

On April 20, 2011, Gille saw Certified Nurse Practitioner Robin L. Holtman at the Community Outreach Clinic in Blessing Hospital in Quincy, Illinois (Outreach Clinic).  Gille weighed 453 pounds at the time.  On examination, Gille was in no acute distress, was morbidly obese, and his lungs were clear to auscultation.[2]  Holtman assessed morbid obesity, depression, low vitamin D, marginally elevated thyroid stimulating hormone

---

[2] Auscultation is the act of listening for sounds within the body to ascertain the condition of organs, such as the lungs.  Dorland's, at 180.

levels, and candidiasis of the groin folds.  Holtman refilled Gille's prescription for Nystatin antifungal cream.  R. 261.

On July 20, 2011, Gille saw Holtman at the Outreach Clinic.  Gille weighed 477.8 pounds.  Gille reported shortness of breath mostly on exertion, and Holtman also observed shortness of breath with exertion. Gille had gained twenty-five pounds since the April 2011 visit.  Holtman described Gille's abdomen as "very pendulous."  Gille's lungs were clear to auscultation.  Gille continued to have elevated thyroid stimulating hormone levels and candidiasis of the groin folds.  Holtman started Gille on thyroid medication.  R. 266.

On July 24, 2011, Gille completed a second Function Report—Adult form (2011 Function Report).  R. 189-96.  Gille stated that he could not work because he could not stand for more than two minutes; he had to constantly move while sitting due to back pain; he got exhausted after walking a quarter mile; and his knees and legs hurt when he stood too long. R. 189.  Gille stated that he usually woke up about 10:00 a.m. and went to bed about midnight.  He spent his days reading, watching television, listening to music, playing with his dog, using the computer, and eating his meals.  R. 190.  He reported that he had to move around every ten minutes due to back pain.  R. 193.

Gille reported that he could not lie down because of back pain, could not breathe easily, and could not get comfortable in any position.  Gille reported that he could not put on his socks or tie his shoes, could not reach to wash his private area, and had to lie down to wipe himself after a bowel movement.  R. 190.

Gille reported that he prepared daily meals such as soup, sandwiches, and frozen dinners.  He stated that he used a microwave oven because he could not stand at the stove for very long.  Gille reported that he did laundry, dishes, and dusting.  He reported that he took "a couple hours" to perform these tasks because he had to take breaks.  R. 191.

Gille reported that he went outside two to three times a week.  He did not drive because he could not fit behind a steering wheel.  He rode in a cart when he went shopping.  He reported that he shopped once a month; and shopping took five minutes.  He reported that he did not pay bills because he had no money.  R. 191-92.

Gille reported that he spent time with others playing games, watching movies, and talking on the telephone.  He went to church and a gaming guild on a weekly basis, and went to the library once every two weeks. R. 193.

Gille reported that he could lift no more than two to three pounds; stand for five minutes; walk one fourth of a block; sit ten minutes; and climb five stair steps.  Gille reported that he could pay attention for several hours, he could follow instructions well, and he got along well with authority figures.  R. 194-95.  He handled stress very poorly.  He reported that he sometimes used a cane.  R. 195.

On August 20, 2011, state agency physician Dr. Victoria Dow, M.D., affirmed the opinions of Dr. Madison's on reconsideration.  R. 279-81. Dr. Dow stated, "Claimant alleging he is worse on Recon.  Medical evidence actually shows that he had lost some weight since he first filed and is doing better. . . .  Initial decision reviewed and found to be correct and is being affirmed as written."  R. 281.

On August 22, 2011, Gille went to the emergency room at Blessing Hospital because of edema and weeping from his pannus.  The records indicate that Gille had erythema involving the pannus for several months. R. 348-57.  Gille was assessed with cellulitis of the pannus.  Gille underwent a CT scan of his abdomen.  The CT scan showed no evidence of colitis, but showed infiltration of fat within the pannus, a fat containing ventral hernia, and left renal calculi.  The radiologist noted that the infiltration of fat within the pannus may have been due to cellulitis.  R. 274.

On August 22, 2011, Dr. Petty saw Gille on a surgical consultation while Gille was at Blessing Hospital.  Dr. Petty assessed fairly mild case of cellulitis.  Dr. Petty opined,

> Given the woody appearance of the skin in general, I think he has some cutaneous lymphedema and that is going to allow for some occasional drainage by itself. . . .
>
> Obviously, to prevent frequent similar problems down the road, he needs to lose multiple 100s of pounds.  If this becomes a severe problem he could ultimately even require a panniculectomy, but that would require a plastic surgeon.  I do not perform panniculectomy.  There is no current abscess . . . .

R. 350.[3]  Gille was discharged from Blessing Hospital on August 23, 2011, with a final diagnosis of cellulitis of abdominal wall pannus.  He was given prescriptions for antibiotics and a medicated topical powder.  R. 356.

On August 29, 2011, Gille saw Dr. Crystal Perry, M.D., at the Blessing Hospital Wound Clinic (Wound Clinic).  R. 358.   Dr. Perry described Gille as, "Massively obese.  With a very large, almost globular over hanging pannus.  It is extreme pendulous and the skin is infiltrated with lymphatic fluid."  Dr. Perry noted several small ulcerations.  Dr. Perry performed excisional debridement under topical anesthesia.  R. 358. Debridement is the removal of dead and contaminated tissue from or adjacent to traumatic or infected lesions to expose healthy tissue.  <u>See</u>

---

[3] A panniculectomy is the surgical excision of the abdominal apron of superficial fat, or pannus, in an obese person.  <u>Dorland's</u>, at 1390.

Dorland's, at 473.  Dr. Perry assessed lymphedema, morbid obesity, and

ulcerations of the abdomen.  She prescribed topical antibiotic and

antifungal medications for the ulcers and abdominal folds.  R. 359.

On September 1, 2011, Gille saw Certified Nurse Practitioner Julie

Ann Barry at the Outreach Clinic for a follow up visit.  R. 360-62.  Gille

weighed 467 pounds at this visit.  On examination, Gille was in no acute

distress.  His heart had regular rate and rhythm.  He had no peripheral

edema.  His lungs were clear to auscultation.  R. 360.

On September 28, 2011, Gille saw Dr. William Birsic, M.D., at the

Wound Clinic.  On examination, Gille had a hanging pannus with gravity

dependent edema, dermatosclerosis of the skin, and a couple of small

ulcerations.[4]  Several of the ulcerations healed using the topical medication

and gauze dressing.  Gille had two ulcers remaining.  Dr. Birsic opined that

the situation would continue.  Dr. Birsic also found no significant candida

infection.  Dr. Birsic continued the topical medications.  R. 362.

On October 9, 2011, Gille's mother, Cheryl Gille, and his aunt, Judy

Emery, each completed a questionnaire regarding Gille's impairments.

R. 283-85, 287-89.  Cheryl Gille stated that Gille could not work because

he was "very overweight."  She stated that he experienced shortness of

---

[4] Dermatosclerosis, also called scleroderma, is a hardening and thickening of the skin.  Dorland's, at 498, 1679.

breath walking from one room to another, his back hurt if he stood a few minutes or took a few steps, and his back hurt sitting.  She reported that she observed him experiencing back pain.  R. 287.  She opined that he could walk twenty feet, stand for two or three minutes, sit for two or three minutes, and lie down for two or three minutes.  R. 288.  She stated that he regularly washed dishes, but sat down while washing them.  R. 288.

Cheryl Gille stated that Gille had trouble taking care of himself after going to the bathroom.  She reported that he had trouble showering because he could not stand very long and he had trouble getting out of the bathtub.  She stated, "He has to have another person take care of a yeast infection and open sores he has under his belly."  R. 288.  Cheryl Gille stated that Gille interacted appropriately in public and could understand and carry out simple instructions.  R. 288-89.

Judy Emery stated that Gille could not work because he was obese.  She stated that he had problems breathing and had difficulty "walking or standing any length of time."  She reported that he could "hardly do steps."  R. 283.  She stated that she observed Gille experiencing lower back pain.  She stated that he grabbed his back when he walked.  R. 283.

Emery stated that Gille could stand for five minutes and needed to sit down after he walked from one room to another.  Emery did not opine on

how long Gille could sit before he had to change positions.  She stated

Gille could lift four pounds with one hand and ten pounds with both hands.

R. 284.

Emery stated that Gille could not get out of a tub.  She stated that he

only took brief showers.  She reported that "He has been doctoring a[n]

infection under his belly area."  She stated that he could not cut his

toenails.  R. 284.  Emery stated that Gille acted appropriately in public and

he could understand and carry out simple instructions.  R. 285.

On October 28, 2011, Gille saw Dr. Thomas Miller, M.D., at the

Outreach Clinic.  Gille went for a check up on his hypothyroidism.  On

examination, Gille's lungs were clear to auscultation.  Dr. Miller

recommended that Gille continue follow up visits to the Wound Clinic to

address "abdominal fold breakdown."  Dr. Miller also recommended

bariatric surgery.  Dr. Miller noted that he would see if he could set up a

bariatric surgery evaluation.  R. 366.

Approximately six months later, on April 25, 2012, Gille saw

Dr. Robert Macnack, M.D., at the Outreach Clinic.  Gille's mother reported

that Gille had more ulcerations on his pannus.  She reported that he

stopped going to the Wound Clinic.  On examination, Gille weighed 490

pounds, his heart had regular rhythm and rate with no murmurs, and his

lungs were clear to auscultation.  Dr. Macnack observed that Gille had a

"large pannus with multiple ulcers on the posterior dorsal surface; some of

the ulcers are as large as 8-10 cm in diameter."  Dr. Macnack referred Gille

to the Wound Clinic again.  Dr. Macnack noted that Gille's "wounds will

need close monitoring."  Dr. Macnack discussed bariatric surgery in detail

with Gille.  Dr. Macnack noted that he would "look into the options of

referring him for bariatric surgery."  R. 367.

On May 9, 2012, Gille went to Dr. Birsic at the Wound Clinic.  R. 212-

13, 305-06.  Gille weighed approximately 500 pounds.  Dr. Birsic observed

that Gille had a large pannus, chronic lymphedema and pressure of the

pannus that caused ulcerations.  Dr. Birsic stated,

> He has no insurance and is just cared for by his mother and
> she has really been trying to put dressings on it, but it has
> gotten very out of hand with malodorous amounts of drainage,
> and she finally brought him back here to the Wound Clinic for
> reevaluation.  He has been here before for the same problem.
> At that time, it was not nearly as severe and it seemed to be
> associated perhaps some moisture problem and candidal
> infection.  She has been trying some Nystatin cream to try to
> treat this problem, but it really just keeps getting worse.  Again,
> there is a fair amount of malodorous appearance to the wounds
> now, as well.

R. 212, 305.  On examination, Gille's lungs were clear and his heart rate

was regular.  Dr. Birsic noted that Gille was "a very obese gentleman, lying

on his left side with an extremely large abdominal pannus hanging off to the

side." Dr. Birsic observed:

> The abdominal pannus shows irregular serpentine ulcerations
> going over large amounts of the anterior adnominal wall
> pannus. The proximate measurements are measuring 18x21
> cm. There are various stages of necrosis, eschar, redness, and
> inflammation as well as some induration, scarring, and edema.

R. 212, 305. Gille's lower extremities showed no pitting edema. R. 212,

306.

Dr. Birsic assessed Gille with chronic ulceration of the abdominal

pannus secondary to lymphedema in the pannus and abnormal skin.

R. 213, 306. He recommended an antibiotic cream called Santyl, but

Gille's mother stated that he had no insurance and could not afford it.

Instead, Dr. Birsic used a Dakin solution to debride the worst areas of

chronic necrosis and told Gille to come back in a week.[5] Dr. Birsic stated,

> The patient should probably consider some sort of bariatric
> surgery or he is not going to do very well, but I am convinced
> that with his lack of insurance and difficulties in obtaining this
> treatment in this area would make that fairly unlikely to happen.

R. 213, 306.

On May 16, 2012, Gille saw Dr. Birsic at the Wound Clinic. R. 307-

09. Gille's condition had "much improved." Dr. Birsic observed, "The

---

[5] A Dakin solution is a sodium hypochlorite solution used as a topical anti-infective for skin and wounds.
Dorland's, at 1757.

malodorous nature of the wound is now resolved." Dr. Birsic stated that

there was no odor to the ulcerations and the "blackened dead eschar" was

gone. R. 309. Birsic prescribed selective debridement and continued use

of the Dakin solution dressings for another week. R. 309. Dr. Birsic

observed generally:

> The patient is in a difficult situation; this pannus is probably
> never going to remain healed for very long, secondary to his
> large size. I do not think that there is anyone in the area that
> could surgically excise it. He is also not convinced that a
> bariatric surgery would help him, but certainly that would be my
> next step on this gentleman is to try to get him to see bariatric
> surgery. He is on medical assistance and that has become
> very difficult, especially since there is no one in this area that
> does the surgery. In any event, we will have a debridement
> today and in followup in a weeks' time.

R. 309. Dr. Birsic debrided under topical anesthetic, "the first 20 square

centimeters followed by a second 20 square centimeters" of Gille's

abdominal ulcerations. R. 307.

On May 30, 2012, Gille saw Dr. Birsic at the Wound Clinic. R. 311.

Dr. Birsic observed that Gille could not lift the pannus himself. He noted

that, "He has to lie on his side, and let it hang off of his bed." His mother

dressed his wounds and ulcers, but she could not lift the pannus or put the

dressing on by herself. She was using Dakin solution on the ulcerations

and Nystatin cream on the fungal infection in the groin area. Dr. Birsic

described Gille's condition as a "really terrible situation." Dr. Birsic again

stated that surgery would be the only permanent solution to the problem.
R. 311.

On June 20, 2012, Gille saw Dr. Birsic at the Wound Clinic.  R. 313.
Dr. Birsic observed that Gille could "barely move secondary to his large
size."  Dr. Birsic observed, "He pretty much is very sedentary and this
pannus hangs off his abdominal wall with significant dependent edema,
rubor, and now ulceration."  R. 313.[6]  Dr. Birsic stated that the infection had
cleared up substantially.  As a result, Dr. Birsic switched from Dakin
medicated dressings to dressings moistened with a saline solution.
Dr. Birsic stated that Gille should experience significant healing, but the
problem would remain chronic until he underwent some sort of pannus
reduction surgery.  Dr. Birsic was not hopeful about the prospect of Gille
undergoing such a procedure, "Unfortunately, the patient probably does not
have any access to [pannus reduction surgery] here in the Quincy area and
would have to go outside the areas for any expertise in this field . . . . ."
R. 313.

On June 27, 2012, Gille saw Dr. Nadia Momin, M.D., at the Outreach
Clinic.  R. 313-14.  Gille weighed 461 pounds.  He had lost 29 pounds
since his April 2012 visit to the Outreach Clinic.  Gille reported that he

---

[6] Rubor is redness indicating inflammation.  Dorland's, at 1682.

wanted to have bariatric surgery.  On examination, Gille's heart showed regular rate and rhythm with no murmurs, and his lungs were clear to auscultation with good inspiratory effort.  Dr. Momin observed that Gille had a large pannus with multiple ulcerations.  R. 314.

On July 18, 2012, Gille saw Dr. Birsic at the Wound Clinic.  R. 316-18.  Dr. Birsic noted that Gille was doing pretty well.  The infection in his ulcers was under control.  Some ulcers had healed.  Gille still had two large ulcerations.  Dr. Birsic observed, "The pannus probably weighs in excess of 30-40 pounds in and of itself.  It has stretched out the skin quite a bit superiorly."  Dr. Birsic performed another debridement.  R. 317.  Dr. Birsic continued the saline dressings because Gille could not afford any other treatment option.  R. 316.  Dr. Birsic noted, "He has no insurance and plastic surgery in this area will not take him, but I do feel a panniculectomy would probably be in the patient's best interest if he can find someone willing to undertake the case."  R. 316.

On August 15, 2012, Gille saw both Dr. Birsic at the Wound Clinic and Dr. Kathy Asbury, M.D., at the Outreach Clinic.  R. 319-21.  Gille weighed 448 pounds.  Gille was in no acute distress, his heart had regular rate and rhythm, his lungs were clear to auscultation, and he had trace edema in his extremities with no cyanosis or clubbing.  R. 319.  Drs. Asbury

and Birsic both stated that a plastic surgeon was willing to perform a panniculectomy if Gille could get on public aid.  R. 319, 321.  Dr. Birsic stated that Gille needed the surgery because of the recurrent wounds on the pannus.  R. 321.

From September 2012 to January 2013, Gille went to the Wound Clinic at least monthly.  He saw either Dr. Birsic or Dr. Perry at these visits.  R. 322-29.  In October and November 2012, Dr. Perry performed a debridement.  Drs. Perry and Birsic noted that Gille's ulcerations were healing and becoming fewer over this time, but not clearing up completely.  See R.322, 325, 328, 329.  Dr. Birsic continued to recommend a panniculectomy and continued to note that a plastic surgeon had agreed to take on Gille for such an operation if he got medical coverage.  R. 322, 328, 329.

On March 6, 2013, Gille saw Dr. Birsic at the Wound Clinic.  R. 379-81.  Dr. Birsic estimated that Gille weighed about 500 pounds at the time.  Dr. Birsic observed, "The pannus is massive and the gravitational dermatitis and gravitational ulceration is tremendous."  R. 381.  Dr. Birsic noted that Gille's ulcerations were a little bigger.  Dr. Birsic performed a "selective debridement."   Dr. Birsic stated again that Gille needed the panniculectomy, but did not have insurance.  R. 381.

On April 12, 2013, the ALJ conducted an evidentiary hearing from St. Louis, Missouri.  R. 32-57.  Gille appeared with his attorney by video conference from Hannibal, Missouri.  R. 11.  Vocational expert Susan Shea appeared by telephone.  R. 34.

Gille testified first.  Gille testified that he was single with no children. He lived with his parents.  He testified that he graduated from high school and took some college course work, but did not get a degree because of finances.  Gille testified that he never worked after high school.  R. 38-39. Gille testified that he looked for work, "but nobody would hire me on account of my odor down below in the folds."  R. 51.

Gille testified that he was 5 feet 5 inches tall and his weight varied from 440 to 470 pounds.  Gille testified that he has unsuccessfully tried to change his diet. Gille testified that he had trouble walking because of his weight.  He testified that he could not walk more than twenty-five to thirty steps before he had to take a rest because he became short of breath. Gille testified that sitting hurt his back and his legs.  He testified that sitting caused his weight to press down on his legs.  R. 39-40.  Gille testified that he could stand for about five minutes before his back hurt and he needed to sit down.  R. 42.  Gille testified that his pannus caused problems.  He testified that his pannus got caught in the recliner.  R. 48.

Gille testified that lying down became uncomfortable after thirty minutes.  He testified that his back and sides would start to hurt.  Gille testified that at night he would sleep about thirty minutes at a time.  He testified that he would sleep lying down for approximately thirty minutes and then sit up for approximately thirty minutes.  Gille testified that he slept one to two hours during the day. R. 40-41.

Gille testified that during a typical day he woke up about 8 a.m., ate, dressed himself, and got on the computer for about thirty minutes.  He testified that his back hurt after thirty minutes.  Gille then would lie down or stand up and stretch.  Gille testified, "I do that several times a day."  R. 42. Gille testified that he alternated every thirty minutes between sitting in his recliner, lying on the couch, and sitting at his computer.  R. 48.  Gille testified that he watched television between 5:00 p.m. to 8:00 p.m.  He testified that he had to alternate between sitting and lying down on the couch every thirty minutes while watching television because his back would start hurting.  He testified that he stretched when he changed positions.  R. 42-43.  Gille testified that he ate supper about 9:00 p.m. or 10:00 p.m., spent time on the computer, and went to bed about midnight. R. 42-43.

Gille testified that he easily became short of breath. He testified that he became short of breath after walking twenty-five to thirty feet, after getting up off the couch, and after lifting objects weighing eight or nine pounds. R. 43. Gille testified that he could not do a push-up or sit-up. He testified that the only exercise he could perform was brief walking. He testified that he could walk in the hallway of his home. He testified that he could walk six laps of the hallway a day. He testified that a lap took about two minutes. R. 43-44.

Gille testified that he could not drive because he could not fit behind the wheel of a car. He testified that he went shopping by riding in a cart at the store. R. 45.

Gille testified about the process of treating his sores. He testified that he washed them and then his mother put saline on them, put a topical antibiotic called Santyl on them, and then put pads on them with tape. R. 45-46. Gille testified that he and his mother changed the dressings when they became saturated. He testified that they changed them at least every day. He testified that once or twice a week, they had to change the dressings twice a day. He testified that the process took fifteen to twenty minutes. He testified that they usually changed the dressings late at night. R. 46-47.

Gille testified that, for the last year, he went to the Wound Clinic every three weeks to have his sores and ulcers debrided.  Gille testified that the process took about an hour.  Gille testified that he did not know how long he has had the sores and ulcers.  He testified the sores and ulcers get better and then they get worse.  R. 50-51.   Gille testified that most of the time he did not feel the sores, although sometimes the sores caused a "grabbing pain."  He testified that the sores and ulcers caused bad odors. R. 47-48.

The ALJ asked Gille why could he not perform a job in which he could sit all day, could stand up to stretch occasionally, and did not need to lift more than ten pounds.  Gille stated that he could not perform that job because of "the smell from my wounds."  Gille testified that the doctors could not do anything about the smell until he underwent surgery.  R. 51.

Vocational expert Shea then testified.  The ALJ asked Shea:

Assume we have a person who's 41 years old with a high school education . . . .  Assume they can lift 20 pounds occasionally and 10 pounds frequently, sit for six of eight hours a day, stand and walk for two of eight hours a day, no more than 10 to 15 minutes at a time, can push and pull within those weight limitations but can only rarely push or pull with the legs and by rarely I mean less than 10 percent of the work day, can occasionally climb ramps and stairs if there's a bannister, can never climb ladders, ropes or scaffolds, can occasionally balance, stoop, . . . and crawl and let's say . . . no crouch, no kneel, must avoid concentrated exposure to fumes, odors,

dusts, gases, poor ventilation, would there be any jobs such a hypothetical individual could perform?

R. 54.  The ALJ previously stated to Shea that Gille had no past work experience.  R. 54.

Shea opined that such a person could work as a sedentary hand assembler, with 3,000 such jobs in Illinois and 280,000 nationally; sedentary machine worker, with 5,000 such jobs in Illinois and 242,000 nationally; and a sedentary table worker with 4,200 such jobs in Illinois and 472,000 nationally.  R. 55.  Shea stated that her opinion would not change if the person had to stand up and stretch as often as every fifteen minutes, assuming the stretching lasted only a minute or less.  R. 55.  Shea opined that the person could not work if he needed to lie down during the workday outside of regular break times.  Shea opined that a person could not work if: (1) the person was malodorous; and (2) the person was close enough to coworkers that the odor would be noticeable.  R. 55.  Shea opined that a malodorous person could not perform the sedentary jobs she identified because he would be too close to coworkers.  R. 56.

At the end of the hearing, the ALJ asked Gille, "Now, if you were to get the surgery would you do anything about going back to work?"  Gille responded, "I could try."  The ALJ replied, "It wasn't exactly the answer I

was looking for."  R. 56.  The ALJ closed the record a week after the April 12, 2013, hearing.  R. 56.

## THE DECISION OF THE ALJ

On May 15, 2013, the ALJ issued his decision.  R. 11-27.  The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires that the claimant not be currently engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to have a severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If true, Step 3 requires a determination of whether the claimant is so severely impaired that he is disabled regardless of his age, education and work experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  To meet this requirement at Step 3, the claimant's condition must meet or be equal to the criteria of one of the impairments specified in 20 C.F.R. Part 404 Subpart P, Appendix 1 (Listing).  20 C.F.R. §§ 404.1520(d), 416.920(d).  If the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to his prior work considering his age, education, work experience, and Residual Functional Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).  If

the claimant cannot return to his prior work, then Step 5 requires a determination of whether the claimant is disabled considering his RFC, age, education, and past work experience.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of presenting evidence and proving the issues on the first four steps.  The Commissioner has the burden on the last step; the Commissioner must show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy.  20 C.F.R. §§ 404.1512, 404.1560(c); Weatherbee v. Astrue, 649 F.3d 565, 569 (7th Cir. 2011); Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ also considered the relevant time frame for determining eligibility for SSI benefits.  A claimant may be entitled to SSI benefits regardless of work history or dates of insurance; however, he may only be eligible to receive benefits commencing on the date he applied for SSI benefits.  20 C.F.R. § 416.335.  Gille applied for SSI benefits on October 20, 2010.  R. 11.

The ALJ determined that Gille met his burden at Steps 1 and 2.  The ALJ determined that Gille had not engaged in substantial gainful activity since he applied on October 20, 2010, and Gille suffered from severe

impairments of obesity, cellulitis, lymphedema, candidiasis, and asthma.
R. 13.

At Step 3, the ALJ determined Gille's impairments or combination of
impairments did not meet or equal a Listing.  R. 16.  The ALJ considered
primarily effects of Gille's obesity in combination with his other impairments
and medical conditions.  The ALJ found that Gille's obesity affected and
complicated his medical impairments.  The ALJ, however, concluded that
Gille's impairments, or combination of impairments, as affected by his
obesity, did not reach "listing level severity."  The ALJ noted that even
though Gilled used a cane, he could "ambulate effectively within the
meaning of the regulations." R. 17

At Step 4, the ALJ first concluded that Gille had the RFC to perform a
limited range of sedentary work.  The ALJ found that Gille could:  lift twenty
pounds occasionally and ten pounds frequently; sit for six hours in an eight-
hour workday; stand and walk for two hours in an eight-hour work day, but
only for fifteen minutes at a time; rarely push and pull with his legs, which
meant less than ten percent of the workday; occasionally climb ramps and
stairs using a banister; never climb ladders, ropes, or scaffolds;
occasionally balance, stoop, and crawl; and never crouch or kneel.  The

ALJ also found that Gille must avoid concentrated exposure to fumes, odors, dusts, gases and poor ventilation.  R. 17.

The ALJ relied on Dr. Leung's examination and the opinions of Drs. Madison and Dow.  R. 22-23, 24-25.  The ALJ also relied on examination notes that showed Gille's lungs were clear to auscultation.  The ALJ also relied on Dr. Birsic's note on May 16, 2012, that Gille's malodorous condition had resolved and that his chronic ulcerated pannus was effectively treated with the cleaning and dressing regimen along with the regular debridements.  R. 21.

The ALJ found Gille's testimony concerning the severity of his condition not to be credible.  The ALJ stated that Gille had a financial incentive to exaggerate his symptoms.  The ALJ noted that one month's SSI payment would exceed the amount of money that Gille earned in any year, and three months of SSI payments would exceed his lifetime earnings to date.  R. 19.  The ALJ found that Gille's testimony about his limited ability to move and lift was inconsistent with Dr. Leung's findings that he could walk fifty feet unaided, though he waddled and limped moderately; could walk longer distances with a cane; was able to get on and off the examination table without difficulty; had full range of motion in his lumbar and cervical spine, shoulders and elbows, and had strength at 4+/5

throughout.  R. 22-23.  The ALJ also relied on other medical records that
showed no difficulty sitting in a chair during office visits, clear lungs, and
effective treatment of his ongoing problem with ulcers and edema on his
pannus.  R. 22-23.

The ALJ also found Gille's report of daily activities inconsistent with
his testimony.  The ALJ noted that Gille had difficulty caring for his personal
hygiene, but still fixed sandwiches, used a microwave, washed dishes, and
dusted.  Gille also regularly went to church, a gaming guild, and the library.
He had the ability to concentrate and understand and follow instructions.
He also could get along well with others.  R. 23-24.  The ALJ concluded
that all of the evidence "detracts from the claimant's allegations of totally
debilitating impairment, and instead support the undersigned's conclusion
that he can perform a reduced range of sedentary work."  R. 24.

The ALJ summarized the reports from Gille's mother Cheryl Gille and
his aunt Judy Emery.  The ALJ found that they were not from an acceptable
medical source and were inconsistent with the medical evidence.  The ALJ
gave their opinions concerning Gille's limitations little weight.  R. 25-26.

The ALJ found at Step 4 that Gille had no relevant past work.  R. 26.

The ALJ found at Step 5 that Gille could perform a significant number
of jobs that exist in the national economy.  The ALJ relied on the RFC

finding; the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2; and Shea's opinion that a person with Gille's age, education, and RFC could perform the hand assembler, sedentary machine worker, and table worker jobs.  R. 27.  The ALJ concluded that Gille was not disabled.

THE DECISION OF THE APPEALS COUNCIL

Gille appealed the decision of the ALJ to the Appeals Council.  On June 5, 2013, Gille's counsel submitted additional medical information (Supplemental Records) to the Appeals Council.  R. 388-98.  The Supplemental Records contained records of Gille's visits to Dr. Birsic at the Wound Clinic on April 3, 2013 and May 29, 2013, and Dr. Asbury at the Wound Clinic on May 1, 2013.  R. 390, 394, 395.

On April 3, 2013, Dr. Birsic stated:

> This patient is basically morbidly obese with a pannus which hangs down off of his abdominal region in such a dramatic fashion that there is gravitational pulling in the lower aspect of his pannus with spontaneous ulceration.  He is being treated with local care.  While we attempt to get the patient seen by plastic surgery, his is without insurance and that making that difficult.  He does state that he does have a disability hearing coming up next week and perhaps they may see that this patient is truly disabled by his weight and should get some sort of medical coverage.

R. 390.  Dr. Birsic strongly recommended the panniculectomy if Gille

received disability medical coverage.  Dr. Birsic described the current state

of the pannus:

> Today the wounds are pretty stable, just really punctate
> irregular ulcerations of a woody edematous skin in the lower
> aspect of his abdominal pannus.  The pannus itself is practically
> unable to be lifted by one person because of its weight.

R. 390

On May 1, 2013, Dr. Asbury performed a debridement.  She noted

that Gille had "an incredibly large pannus,"   R. 395.

On May 29, 2013, Dr. Birsic observed that Gille had a "60-70 pound

pannus."   Dr. Birsic observed that the pannus had "severe woody edema

and serpiginous ulcerations."  Dr. Birsic stated, "He is being treated as best

he can with his limited resources with the dressings, etc."  Dr. Birsic again

recommended the panniculectomy.  Dr. Birsic stated that "It is a

troublesome operation with a lot of wound healing problems afterwards, but

it is probably the only thing that is going to allow this area to heal

completely."  R. 394.

On June 16, 2014, the Appeals Council issued a Notice of Appeals

Council Action (Notice).  R. 1-2.  The Notice stated that the Council denied

Gille's request for review.  The decision of the ALJ then became the final

decision of the Commissioner.  R. 1.  The Notice stated, in part,

> In looking at your case, we considered the reasons you
> disagree with the decision and the additional evidence listed on
> the enclosed Order of the Appeals Council.
>
> We considered whether the Administrative Law Judge's action,
> findings, or conclusion are contrary to the weight of the
> evidence of record.  We found that this information does not
> provide a basis for changing the Administrative Law Judge's
> decision.

R. 1-2.  The appendix to the Notice and the accompanying Order of the

Appeals Council listed the Supplemental Records.

Gille then filed this action for judicial review.

## ANALYSIS

This Court reviews the Decision of the Commissioner to determine

whether it is supported by substantial evidence.  Substantial evidence is

"such relevant evidence as a reasonable mind might accept as adequate"

to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971).

This Court must accept the findings if they are supported by substantial

evidence, and may not substitute its judgment.  Delgado v. Bowen, 782

F.2d 79, 82 (7th Cir. 1986).  This Court will not review the credibility

determinations of the ALJ unless the determinations lack any explanation

or support in the record.  Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir.

2008).  The ALJ must articulate at least minimally his analysis of all

relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).

The ALJ must "build an accurate and logical bridge from the evidence to his conclusion."  Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

In this case, the Court finds the ALJ's credibility finding is supported by substantial evidence.  The medical evidence, including Dr. Leung's examination, provides substantial evidence to support that finding.  See Elder, 529 F.3d at 413-14.

The ALJ, however, committed reversible error when he failed to ask vocational expert Shea hypothetical questions that covered all of the material evidence.  The hypothetical questions to a vocational expert must "incorporate all relevant limitations from which the claimant suffers."  See Kasarsky v. Barnhart, 335 F.3d 539, 543 (7th Cir. 2002).  In this case, the ALJ needed to ask vocational expert Shea whether the hypothetical person could work if he had to miss work once every three weeks to a month to go to the doctor.

The evidence shows that Gille had to go to the doctor once every three weeks to a month to avoid becoming malodorous.  Shea opined that a malodorous person could not perform the jobs she identified.  Gille's ulcerations and sores became malodorous at least twice in January 2011 and April 2012.  The ALJ found that Gille could control the potentially malodorous nature of his abdominal ulcers and sores through this

treatment regimen.  This finding is supported by substantial evidence.  Gille

stopped going to the Wound Clinic from October 2011 to April 2012; during

that time he developed an infection in his ulcers and became malodorous.

Gille resumed regular treatment at the Wound Clinic in April 2012.  Within a

month, the odor resolved.  Gille, however, needed regular visits for

debridement of his ulcers as part of his treatment regimen.  Gille, therefore,

will need to miss work once every three weeks to a month to maintain his

treatment regimen, and so, avoid becoming malodorous.[7]

Vocational experts differ on the issue of absenteeism and

employability.  For example, one expert has opined that a person cannot be

absent for more than one-half a day per month or six days a year and

maintain employment.  Alesia v. Astrue, 789 F.Supp.2d 921, 926 (N.D. Ill.

2011).  Another opined that a person could be absent up to two days per

month.  Terry v. Astrue, 580 F.3d 471, 475 (7th Cir. 2009).  See also e.g.,

Scott v. Colvin, 2014 WL 32389, at *6 (expert opined that a person absent

two days per month could not work); Susalla v. Astrue, 2012 WL 20262168,

at *7 (June 5, 2012) (expert opined that a person absent more than one-

and-a-half days per month could not work).  The differences of opinion may

reflect factual differences in the cases.

---

[7] The Court recognizes that the ALJ may conclude on remand that Gille can avoid becoming malodorous without regular doctor visits for debridements.  If so, the ALJ should explain the evidentiary basis for the conclusion.

Given the variation of opinions, the ALJ will need to secure expert testimony or other competent evidence on the question of whether Gille can miss work one day every three weeks to a month and still remain employable under the facts of this case.  Since that material question remains unanswered, the matter must be remanded.

Gille also complains that the Appeals Council erred in rejecting the new evidence submitted after the ALJ's decision as not new or material. See Farrell v. Astrue, 692 F.3d 767, 770-71 (7th Cir. 2012).  The Court does not need to reach this issue because the ALJ's decision must be reversed and remanded.  On remand, the ALJ can consider the evidence that was submitted to the Appeals Council, along with any other evidence that may be appropriate under the Commission's procedures.  See Farrell, 692 F.3d at 768, 773 (ALJ to take "fresh look" at case on remand).

THEREFORE, THIS COURT RECOMMENDS that Plaintiff Glenn E. Gille's Brief in Support of Motion for Summary Judgment (d/e 10) should be ALLOWED, and Defendant Commissioner of Social Security's Motion for Summary Affirmance (d/e 13) should be DENIED, and the decision of the Commissioner should be REVERSED and REMANDED.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk of the Court within

fourteen days after service of a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2).  Failure to file a timely objection will constitute a waiver of objections on appeal.  <u>See</u> <u>Video Views, Inc. v. Studio 21, Ltd.</u>, 797 F.2d 538, 539 (7th Cir. 1986).  <u>See</u> <u>Local Rule</u> 72.2.

ENTER:  February 22, 2016

_____<i>s/ Tom Schanzle-Haskins</i>_____
UNITED STATES MAGISTRATE JUDGE